**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 96-30991

EUGENE VICTOR,

Plaintiff-Appellant,

VERSUS

WAYNE McELVEEN, Individually and as Sheriff of the Parish of
Calcasieu,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Louisiana

August 6, 1998

Before DeMOSS and DENNIS, Circuit Judges, and ROSENTHAL[*], District
Judge.

DENNIS, Circuit Judge:

In this case we review the district court's summary judgment dismissing an action by a former sheriff's deputy under 42 U.S.C. § 1983 for damages resulting from the sheriff's wrongful termination of his employment in violation of his First Amendment right to free speech. The deputy, Eugene Victor, an African-

---

[*] District Judge of the Southern District of Texas, sitting by designation.

American, was discharged by the sheriff for statements Victor made at a workplace meeting to which the sheriff had summoned a group of black deputies to explain and discuss the implementation of a Community Oriented Police Servicing ("COPS") program for a community predominantly of black citizens. The sheriff planned to employ an all-black, 12-deputy workforce in the program; another purpose of the meeting was to solicit applicants for those positions. In response to the sheriff's request for input from the deputies about the program, while a newspaper reporter was present, Victor complained that only black deputies had been required to attend the meeting, stated that deputies of all races should have been involved, and asserted that an equal number of black and white deputies should be employed in the program to avoid a situation similar to that which prevailed in 1980; at that time, according to Victor, black deputies were permitted to patrol only in black neighborhoods. A local newspaper ran a story on the meeting highlighting some of Victor's remarks. Four days after the meeting the sheriff fired Victor for "making false statements regarding this department during an informational meeting with other deputies, and causing dissension within the department."

The district court held that: (1) Victor's speech did not address a matter of public concern; and (2) Victor's expressions -- particularly his statement that there were enough black people at the meeting for a "Tarzan movie" -- caused dissension, contained irrelevant statements, and interfered with effective operations;

2

therefore, Victor's interest in making his statements was outweighed by the interest of the state in the effective functioning of the sheriff's office. We reverse and remand for further proceedings. Victor's protest against racial discrimination was both inherently, and in content, form and context, a matter of public concern. There are genuine disputes as to issues of material facts determinative of whether any of Victor's statements were knowingly or recklessly false and whether his speech as a whole so interfered with the efficient functioning of the sheriff's office that the state's interest therein outweighs Victor's First Amendment rights.

I

The district court's conclusion that summary judgment was appropriate is a question which we review *de novo*. *See, e.g.*, *Dawkins v. Sears Roebuck and Co.*, 109 F.3d 241, 242 (5th Cir. 1997). Summary judgment is proper only when it appears that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). On summary judgment the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

II

Construing the record in the light most favorable to the nonmovant, Victor, we draw inferences from the underlying facts as follows. Eugene Victor served as a deputy marshal under then-city marshal Wayne McElveen from 1973 until 1980. In 1980 after McElveen was elected Sheriff of Calcasieu Parish, he employed Victor as a deputy. Victor was assigned to a succession of jobs over the years: graveyard shift patrol, traffic department, internal affairs, and the transportation division. Victor finally served as a courtroom bailiff for the two years before his dismissal on December 6, 1994.

In 1994, the Calcasieu Parish Sheriff's Department received a federal grant under the Community Oriented Police Servicing ("COPS") program, a program that provides federal funds to establish community-based policing in high crime areas. The department received the grant for North Lake Charles, an area inhabited predominantly by black citizens. Sheriff McElveen called an informational meeting to discuss implementation of the COPS program. The sheriff's department sent letters to a group of black deputies informing them that the meeting was "mandatory" and that their attendance was "required." The department also posted notice of the meeting in the squad room. The notice invited, but did not require, all department personnel to attend the meeting. Victor testified in his deposition that the general notice was not posted until after the meeting began.

4

The meeting was held on December 1, 1994. Of the 75 to 80 persons at the meeting only four or five were white, including the sheriff and one or two supervisory deputies. A newspaper reporter covered the event although she had not been invited by the sheriff's office. The sheriff, after briefly explaining his plans for the COPS program, asked for questions and comments from the deputies about the program. Deputy Victor was the first to be recognized. Before voicing his concerns, Victor asked for and received the sheriff's assurance that he could speak freely without "any fear of any retribution of any kind." Victor complained that the sheriff's department had required the presence of the group of black deputies but not the attendance of any white deputy. He began with a remark that there were "enough black people here to do a Tarzan movie," or words to that effect. He perceived the sheriff's plan as calling for the employment of only black deputies in the program. He protested that deputies of other ethnic groups should be included in the meeting and the program. According to one deputy present, Victor recommended that six white and six black deputies be assigned to the program. Victor asserted that in 1980 the sheriff's department had a policy, since abolished, of restricting black deputies' patrol duties to North Lake Charles, an area populated mainly by black people. His remarks may be fairly characterized as a warning that a COPS program with only black deputies on front line duty would be a step backward, detrimental to the community and the department. After Victor's remarks, the

5

sheriff and other deputies stated that it was not true that the department in 1980 had restricted the patrols of black deputies to North Lake Charles.  Further, the sheriff explained that, even if the twelve COPS deputies closely involved with the community were to be black, the regular deputy patrols within the area would continue to include white officers.  The sheriff acknowledged in his deposition, that subsequent to the meeting he had employed eleven black and one white deputies for the COPS program.  The sheriff testified, however, that this racial makeup was required for an effective COPS program, and was not a sign of bigotry as he thought Victor had stated or suggested at the meeting.  Other black deputies disagreed with Victor and contended that providing twelve black deputies for community oriented police services would be beneficial to the deputies and the community.  After Victor's remarks and the reactions thereto, which consumed about ten minutes, the meeting resumed with a more detailed explanation of the proposed COPS program by Richard F. Tanous, the sheriff's department systems administrator, and concluded without any untoward incident.  The next day the newspaper published an article about the meeting, featuring some of Victor's statements.  The sheriff  fired Victor four days after the meeting for "making false statements regarding this department during an informational meeting with other deputies, and causing dissension within the department."

Victor brought the present action under 48 U.S.C. § 1983

6

against Sheriff Wayne McElveen, individually and as sheriff of Calcasieu Parish, alleging that the sheriff's termination of his employment violated his right to free speech secured by the First and Fourteenth Amendments. The suit also alleged that Sheriff McElveen's actions violated his rights under the Fifth and Fourteenth Amendments. The sheriff moved for summary judgment denying Victor's claims and sustaining his defense of qualified immunity. The district court granted summary judgment dismissing Victor's claims with prejudice. The court concluded that Victor's speech did not address a matter of public concern, as he spoke primarily in his role as a public employee and not in his role as a citizen. The district court further held that, assuming the speech involved a matter of public concern, the government's interest, as an employer, outweighed Victor's First Amendment interest in commenting on the matter. The district court also granted summary judgment for Sheriff McElveen on Victor's Fifth and Fourteenth Amendment claim. The district court did not rule on Sheriff McElveen's defense of qualified immunity.

Victor appeals from the district court's decision that his First Amendment rights were not violated. He does not challenge dismissal of the Fifth and Fourteenth Amendment claim.

III

It has long been established that the government may not constitutionally compel persons to relinquish their First Amendment

7

rights as a condition of public employment. *E.g.*, *Keyishian v. Board of Regents*, 385 U.S. 589 (1967); *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Perry v. Sindermann*, 408 U.S. 593 (1972). The *Pickering* Court held that the First Amendment protects the rights of public employees "as citizens to comment on matters of public interest" in connection with the operation of the government agencies for which they work. *Pickering*, 391 U.S. at 568. The government has legitimate interests in regulating the speech of its employees, however, that differ significantly from its interests in regulating the speech of people generally. *Id.* The scope of public employees' First Amendment rights must be determined by balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

The threshold question in applying the *Pickering* balancing test is whether Victor's speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick*, 461 U.S. at 146. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-148. "'[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they [were]

8

made to see whether or not they . . . are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.'" *Id.* at 150 n.10 (quoting *Pennekamp v. Florida*, 328 U.S. 331, 335 (1946)(footnote omitted)). The employee's "right to protest racial discrimination, [however, is] a matter inherently of public concern [and] is not forfeited by her choice of a private[, rather than a public] forum." *Id.* at 148 n.8 (citing *Givhan v. Western Line Consol. Sch. Dist.*, 439 US 410, 415-416 (1979); *see also Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1269 (5th Cir. 1992)("The content of [the] speech -- reports of sexual harassment perpetrated on [plaintiff] and other women -- is of great public concern.").

The content of Victor's speech was inherently of public concern because it was a protest against racial discrimination. Victor's protest may be fairly characterized as criticizing the sheriff for holding a meeting that only African-American deputies were required to attend for the purpose of explaining and discussing the implementation of a federally funded program that would serve a community of predominantly black residents. His remarks may be reasonably viewed as expressing concerns that deputies of other races or ethnic groups would not be involved in planning or carrying out the program in the black community. Victor's comments indicated his apprehension that the sheriff planned to employ only black deputies in the COPS program, which he

9

thought would be a regressive step for the community and the department. He stated that the department had a policy in 1980 of assigning black deputies to serve exclusively in predominantly black neighborhoods. Consequently, Victor's expression can be "fairly considered as relating to [a] matter of political, social, or other concern to the community[.]" *Connick*, 461 U.S. at 146.

Considering Victor's statement with respect to its context and form confirms that the speech dealt with a matter of public concern. The statement was made in the course of a meeting arranged by the sheriff to inform a group of black deputies about a new federally funded program to be administered by the sheriff's office to provide community oriented police service in a high crime area inhabited predominantly by black citizens. The meeting was attended by a representative of the press. The sheriff, after his initial remarks describing the program, invited the deputies to ask questions and make comments about the program. The sheriff recognized Victor for this purpose. Before making his remarks, Victor asked the sheriff for and was given assurance that he could speak freely without "any fear of any retribution of any kind."

Victor spoke as a citizen on a matter of public concern, not as an employee upon matters only of personal interest. *See Connick*, 461 U.S. at 147. At the time of his remarks, Victor was well pleased with his position as a courtroom bailiff; there was no evidence that he was a disgruntled employee or had any personal

10

reason to protest what he perceived to be the potential racially discriminatory effects of the sheriff's approach to the new program. Because Victor knew of the presence of the newspaper reporter, it may be reasonably inferred that he intended to inform the public of his criticism of the racial orientation of the deputies' meeting and the sheriff's plan to employ only black deputies in the COPS program. Thus, Victor's speech had the earmarks of a citizen speaking out publicly on a matter of general concern, not that of an employee engaged in a personal employment dispute. *See id.* at 148 & n.8. Consequently, the context of Victor's remarks, as well as their inherent characteristic as a protest against racial discrimination, demonstrate that he spoke on a matter of public interest and concern.

The sheriff disputes the accuracy of Victor's reference to the department's past policy of ethnical patrol assignments and deplores Victor's "Tarzan movie" simile as upsetting to him and his employees. However, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987); *see also id.*("'[D]ebate on public issues  should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'")(quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)); *Bond v. Floyd*, 385 U.S. 116,

11

136 (1966)("Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected.")  Also, of course, genuine disputes as to issues of material facts must be resolved at trial, not by summary judgment.

Because Victor's statement addressed a matter of public concern, *Pickering* next requires that we balance Victor's interest in making his statement against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.  The employee's statement is not considered in a vacuum, however. *Rankin*, 483 U.S. at 388.  "In performing the balancing, . . . the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose."  *Id.* (citing *Connick*, 461 U.S. at 152-153, and *Givhan*, 439 U.S. at 415 n.4). The Supreme Court has recognized as pertinent considerations "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.*

The state interest considerations focus on the effective functioning of the public employer's enterprise.  "Interference

12

with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Id.* In this respect, however, the sheriff fails to demonstrate, without dispute as to material facts, a state interest that outweighs Victor's First Amendment rights. Although Victor's statement was made at the workplace, there is a genuine dispute as to whether it interfered with the efficient functioning of the sheriff's office.

The summary judgment evidence contains the testimony of several of the deputies who attended the meeting. Deputy Steward testified in his deposition that he "had a heated conversation" with Victor following the meeting. But Steward said that he was "not upset to the intent that I was ready to fight him or hate him," and that, in fact, he liked Victor before and after the meeting. One deputy testified that the comments were only slightly disruptive, while another was reported to have been "upset" by them. One deputy testified that Victor "disrupted the meeting bad." Richard Tanous, the department systems administrator who made the main presentation at the meeting, testified, however, that he was able to fully and effectively perform his duties following Victor's remarks. He testified that any disruption was over before he made his presentation. Tanous described the effect of the comments on the meeting as "more frustration on the part of the administration and of the other employees who were there that were

13

having to listen to it, that they wanted to hear what [the COPS program] was going to be about and [Victor] was taking up valuable time with these questions and comments without knowing what was going to be said." Tanous also stated that Victor's remarks "absolutely [did] not" cause racial tension in the department after the meeting. When asked how long the "dissension" caused by Victor's statements lasted, the sheriff testified that "it lasted a couple of days at least." Viewing the summary judgment record in the light most favorable to Victor, we conclude that the evidence of record shows that Victor's remarks in response to the sheriff's invitation of comments caused no unanticipated delays or disruption or interference with the meeting or the functioning of the sheriff's office.

Moreover, concerns about maintaining harmony and eliminating disruption cannot be the sole measure of government interest when the employee's speech furthers other important state interests. For example, in *Wilson v. UT Health Center*, 973 F.2d 1263 (5th Cir. 1992), the defendant argued that a police officer's interest in reporting sexual harassment within the department was outweighed by the police force's interest in eliminating dissension and providing efficient police protection. This court concluded, however, that if a jury determines that the police officer "reported sexual harassment in good faith," then the state's "interest in maintaining a police force that is free of sexual intimidation,

14

which [her] good faith reports would serve, outweighs any interest in departmental efficiency and harmony." *Id.* at 1270.

Similarly, a reasonable trier of fact could find that Victor's good faith comments would serve a very important state interest -- the prevention or elimination of racial discrimination and its vestiges within state agencies, entities and departments. The defendant attempts to justify his actions by noting that "[a] charge of racism can most definitely affect morale, efficiency, and functions of any interracial work environment." The mere fact that racial issues can be divisive, however, does not excuse retaliation against an employee who in good faith raises perceived racially discriminatory practices in an attempt to promote the welfare of the governmental department. *Cf. id.* The record contains no concrete evidence, as opposed to surmise or suspicion, that Victor made any statement with knowing or reckless falsity or acted in bad faith with an intent to disrupt the meeting or the sheriff's operations for an improper reason.

The fact that Victor's remarks were made in response to the sheriff's express invitation to comment freely, frankly and without fear of repercussion, on the COPS program as explained by the sheriff, weighs heavily in favor of an inference that sincere, critical responses should not have been surprising or considered as an interference. As this court recognized in *Bickel v. Burkhart*, 632 F.2d 1251, 1257 (5th Cir. 1980), when an employee speaks in

15

response to an invitation and on a matter pertinent to that request, the context factor weighs in his favor. *Cf. Warnock v. Pecos County*, 116 F.3d 776, 781 (5th Cir. 1997) ("When a public employer grants an employee the task of serving as ombudsman within a particular field, it may not fire that employee for accurate and thorough criticisms of the relevant governmental practices."). *Bickel* concerned the First Amendment claim of a firefighter who was discharged when he voiced concerns about the fire department and the state of its equipment at a departmental meeting. The *Bickel* court made the following observation:

> The context in which the plaintiff spoke out is important. The record clearly indicates that after Paschal made his presentation on salaries, he opened the meeting to discussion. According to one fireman in attendance, "[i]t was just an open, frank discussion, 'If you have anything on your mind, let's get it out in the open and talk about it, anything.'" Similarly, Bickel testified that he thought Paschal was effectively asking for "input on what we thought about anything that had to do with the fire service."

*Bickel*, 632 F.2d at 1257. Here, the summary judgment record establishes that Sheriff McElveen invited officers to comment on the planning and implementation of the COPS program. Victor made his remarks in response to this invitation and did so only after

16

receiving assurances from the sheriff that he would not be retaliated against for his speech.  In addition, the comments were germane to the sheriff's request for input on the planning and implementing of the COPS program.  As in *Bickel*, the context of speech within a response to an invitation weighs in favor of protecting the invited speaker's right of expression.

                                    IV

Because this matter is before us following a grant of summary judgment, we make no intimations regarding the correctness *vel non* of either party's factual assertions or the final outcome after a trial on the merits. See *Rankin v. Klevenhagen*, 5 F.3d 103, 108 (5th Cir. 1993).  For the reasons assigned, the summary judgment of the district court is REVERSED and the case is REMANDED for further proceedings.