GEORGE COX, APPELLANT, V. CIVIL SERVICE COMMISSION OF
DOUGLAS COUNTY, NEBRASKA, APPELLEE.
614 N.W. 2d 273

Filed July 14, 2000. No. S-99-591.

Michael P. Dowd, of Dowd & Dowd, for appellant.

James S. Jansen, Douglas County Attorney, and Jennifer K. Johnson for appellee.

Amy A. Miller for amicus curiae American Civil Liberties Union Foundation of Nebraska.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The Douglas County Department of Correctional Services (Department) brought disciplinary charges against the appellant, George Cox, after he spoke to a reporter regarding allegations of racial discrimination within the Department. Cox had the permission of several of the Department's correctional center supervisors to speak to the reporter. Following a predisciplinary hearing, the Department terminated Cox's employment. Cox appealed his termination of employment to the Douglas County Civil Service Commission (Commission), which affirmed. The district court affirmed after hearing Cox's petition in error. Cox appealed, and we granted his petition to bypass the Nebraska Court of Appeals. We determine as a matter of law that the termination of employment violated Cox's First Amendment right to freedom of speech. Accordingly, we reverse.

## BACKGROUND

After speaking with a television reporter, Cox was sent a letter notifying him of a predisciplinary hearing which stated:

The charge(s) against you are:

On 20 AUG 98, at approximately 1610 hours, you were in Administration stating that you had to call Trina Crieghton [sic], Channel 3. You went to the break room in the Administrative Offices and used the telephone. Another employee overheard your conversation with Ms. Crieghton [sic]. During the conversation, you stated that the jail had a racial problem and that the union president has a hood in his trunk. Later in the conversation you stated that we have a Captain that's Hitler . . . Capt. [John] Lee. You went on

to say that the Sheriff is trying to take over the jail and does not have any black supervisors. You also stated that we have a black warden that doesn't have any duties. Also during the telephone conversation you stated that we had a Warden who summoned a black female officer to her office but never acknowledged her presence or stated that she was in a meeting, just made the black officer wait outside her office.

This type of misconduct is covered by the Douglas County Civil Service Commission Personnel Policy Manual, Article 13: Section 5, Offense 15; and General Order 6-97, Rules of Conduct.

Knowingly making false or malicious statements with the intent to harm or destroy the reputation, authority or official standing of individuals or organizations.

Cox's employment was terminated following the predisciplinary hearing. The letter notifying Cox of his termination stated that Cox admitted making the statements and was signed by the Douglas County sheriff, Timothy F. Dunning. Cox appealed his termination to the Commission.

### DEPARTMENT'S EVIDENCE

At the hearing before the Commission, the Department presented evidence from Susan Fletcher, a staffing coordinator at the Department. Fletcher testified that on August 20, 1998, she entered a break room where Cox was on the telephone and overheard his side of the conversation. At the time, Fletcher was unaware of to whom Cox was speaking. Fletcher testified that Cox was aware of her presence, that he was speaking in a normal tone, and that she could hear him clearly. Fletcher testified that another employee was also present in the break room.

Fletcher testified that she heard Cox state that the sheriff was trying to take over the correctional center and did not have any black leadership; that there was a black warden, but he did not have any duties; and that he felt that some correctional center employees were racists. Fletcher later stated it was the general consensus at the correctional center that it was true there was a black warden with no duties. Fletcher also testified that she heard Cox say there was a female warden who summoned a

black female officer to her office and then made the officer stand in the hallway and never acknowledged the officer's presence. Fletcher later testified that she had been told by another employee that such an incident had occurred. Fletcher testified that Cox stated that a union president carries a hood in his trunk, but then stated, "No, that's rumor," and that he finished the conversation by stating, "We have a captain that acts like Hitler" and "His name [is] Captain Lee." When asked if Cox appeared to be answering questions or offering information, Fletcher stated that he appeared to be "story-telling." Following the incident, Fletcher wrote a report of the incident on the request of Warden Bill McPhillips. On cross-examination, Fletcher admitted that she did not have knowledge of whether Cox was possibly repeating questions that were asked of him.

Ross Stebbins, the union president and a sergeant at the correctional center, testified regarding the rumor that he had a hood in his trunk. Stebbins stated that he interpreted this to mean a Ku Klux Klan hood and testified that if such a rumor were to get out around the correctional center, his life could be in danger. As a result, Stebbins filed a complaint of a hostile work environment based on that rumor. At one point, Stebbins testified that he felt he was defamed by the allegation because of the damage such a statement could do to his reputation.

Stebbins testified that in the past, Cox had spoken to him about racism at the correctional center and that Cox had stated that he was going to "blow the lid off the County" because he felt he was being treated unfairly and there was racism within the Department. Stebbins' testimony indicates that Cox may have felt he was being treated unfairly because he had previously been demoted. However, the record is not clear regarding the details of the demotion. Stebbins' testimony indicates that he was Cox's union representative at the time these statements were made and that although he found the content of Cox's comments to be inappropriate, it was not inappropriate for Cox to bring such complaints to him. Cox denies making any such statements to Stebbins.

Dunning, who was in charge of employment decisions at the correctional center, testified that he believed the remarks made by Cox brought disrepute to the correctional center. Dunning

also testified that the comments could affect the safety and security of employees and inmates by causing undue violence within the correctional center. Dunning testified that following an investigation, the accuracy of the comments made by Cox was not substantiated. However, Dunning's testimony indicates that the accuracy of the comments was not disproved by his investigation either. Dunning admitted that Cox had been given permission by McPhillips to speak with Creighton and that there was not a rule in effect that prohibited officers from speaking with the media. He then stated that he believed that when Cox spoke with Creighton, he went beyond the scope of permission he was given to talk to her. However, Dunning was unable to state with any specificity based on personal knowledge what that scope might have been.

Dunning stated he had recommended that Cox's employment be terminated due to the severity of the remarks and the fact that a prior hostile work environment complaint had been filed against him. The record contains no further details regarding the prior complaint other than the fact that Cox later testified that the complaint was still pending. Dunning also stated that even if Cox had been repeating Creighton's questions and had expressed only his personal opinion, he still would have recommended that Cox's employment be terminated. The record indicates that regardless of the circumstances, Dunning would have terminated Cox's employment because he went outside the chain of authority when making allegations of racial discrimination.

Dunning signed the letter notifying Cox of his termination of employment. Dunning admitted that he sat on the predisciplinary hearing board and stated that he felt it was appropriate for him to serve in that capacity in Cox's case even though one of the topics of Cox's conversation with Creighton concerned statements that Dunning was trying to take over the correctional center and that Dunning had no black supervisors in his office.

## Cox's Evidence

At the hearing, Cox testified that prior to his termination, he held the position of sergeant and was the team leader of a 10- to 16-person team. According to Cox, on August 20, 1998, he

received two to three messages that Creighton was trying to get in touch with him. Cox then informed McPhillips that Creighton had been trying to get in touch with him. Cox testified that he asked McPhillips if he had McPhillips' permission to talk to Creighton and that McPhillips answered, "Yes." Cox then testified that he reemphasized his request by stating: "Can I talk to her, answer any questions that she asks me about anything other than inmates . . . because I know policy is you cannot discuss inmates." Cox testified that McPhillips replied "you're right." Following this conversation, Cox attended a meeting and then went with McPhillips to see Warden Ann O'Connor, the warden in charge of uniformed officers, about Cox's speaking with Creighton. The record indicates that Cox did this because he wanted to avoid any repercussions that could occur from "jumping the chain of command" by speaking to Creighton without permission. According to Cox, O'Connor did not voice any objections to his speaking with Creighton, and McPhillips did not indicate to Cox that he was limited in the scope of his conversation with Creighton. After speaking with O'Connor, Cox also informed a third warden that he was going to speak with Creighton. Cox testified that at the end of the day, he again sought out McPhillips and asked if he could answer questions from Creighton about anything other than inmates. According to Cox, McPhillips answered "yes." There is no evidence in the record that disputes Cox's testimony that he had permission to talk with Creighton.

Cox next went to a break room, where a telephone for general use was available, and called Creighton. When Cox first began his conversation with Creighton, the break room was empty. However, while he was on the telephone, other people entered the room. On the whole, Cox estimated that his conversation with Creighton lasted 15 to 20 minutes and that other people were present in the room during approximately 5 to 10 minutes of the conversation. Cox testified that he did not invite anyone else to take part in the conversation, that he did not give Creighton permission to distribute any portion of the conversation to others, and that he told Creighton numerous times that he would not appear on television out of concern that his statements would be perceived as statements of fact rather than as his personal opinion.

Cox admitted that the people in the break room with him were able to hear his conversation, and he stated that he did not attempt to hide the conversation from them. Cox stated that it did not really bother him if the people in the break room heard him because he was expressing his personal opinions. Cox testified that at the end of the conversation, he again refused to participate in a television appearance even if his face would be disguised.

Cox testified that during his conversation with Creighton, he responded to questions posed by her. Specifically, Cox testified regarding the following questions and responses:

(1) Cox testified that Creighton asked him if he felt there was a "racial problem with some racial tension" within the correctional center. Cox responded "[y]es, I do" to this question. Cox testified that he still held this belief at the time of the hearing but that he never indicated to Creighton that some of the correctional center employees were in fact racists.

(2) Cox testified that Creighton asked him if he heard anything about the union president, Stebbins, possibly having a hood in his trunk. Cox responded, "I have heard that rumor." Cox testified that he also repeated the statement made to him by Creighton that "[t]he union president has a hood in his trunk" and stated "[y]es, I think he may have." Cox testified that he never made a statement indicating that the union president did, in fact, have a hood in his trunk.

(3) Cox testified that Creighton asked him about concerns she indicated were expressed to the county board that Dunning was "taking over the jail for one main purpose only." Cox stated that Creighton specifically asked "since you've been here 11 or 12 years, do you know of any black supervisors in the Sheriff's Department?" Cox responded that to the best of his knowledge, there had never been a black supervisor in the sheriff's department during his tenure.

(4) Cox testified that Creighton asked him about a black warden, Larry Johnson, by stating, "I've known Larry for a long time. What's going on down at the Correctional Center?" In response, Cox explained that Johnson used to be in charge of all uniformed officers, but then employees were told that O'Connor was assigned to take his place for a period of months in order to

learn the position, while Johnson was to learn the position held by McPhillips and a Warden Miller. Miller subsequently retired, and no one assumed his duties. The record indicates this caused people to question whether Johnson still had a job. Cox testified that he then told Creighton, "To the best of my knowledge, he basically has no duties."

(5) Cox testified that on one occasion, Rita Walker, an employee on his team, came to him with a complaint and stated that she wished to talk with O'Connor. As a result, a meeting was arranged. However, Walker reported to Cox the next day that she had been kept waiting outside of O'Connor's office with no explanation and stated that "[w]ell, I'll bet if I was a white officer, she wouldn't have made me wait." Cox testified that this statement made him nervous and that he arranged for a new appointment to be made for Walker to talk to O'Connor. Cox testified that in regard to this incident, Creighton stated to him, "I heard that you was [sic] involved with an incident where one of the people on your team was summoned to the warden's office and she wasn't talked to." Cox testified that he replied, "Yes . . . that's right."

(6) Cox testified that Creighton asked him " '[w]hat's up with this Captain Lee that just thinks he does what he wants when he wants? . . . I've had people make comments that he acts like he's a dictator or possibly even a Hitler, or something of that nature.' " Cox testified that he told Creighton that he had just left a meeting in which it was discussed that Lee ran his shift the way he wanted, that there was some animosity regarding this, and that he was referred to as "Hitler" at the meeting. Cox testified that he did not tell Creighton that Lee was in fact "a Hitler" and that he did not create the term or first use the term in relation to Lee during the conversation.

Cox testified that following the call, he informed McPhillips that he had completed the call and that McPhillips did not make any inquiry regarding the substance of the conversation. Cox testified that all of the statements he made were not false and were expressions of his personal opinion. Cox also testified that he had no intent to harm others by making the statements.

Regina Davis, as the union steward, represented Cox at his predisciplinary hearing. Davis testified that Cox never stated or

admitted during the hearing that he told Creighton as a matter of fact that the union president had a hood in his car. Davis testified that based on her observations and experience within the correctional center setting, she agreed with the statement that the correctional center had a problem with racial discrimination. Davis also testified that over the course of her experience with the Department, she could not recall a black supervisor within the sheriff's department. In regard to the warden who was alleged to have no job duties, Davis indicated that at the time Cox spoke with Creighton, the statement was consistent with her understanding of the situation. Davis testified that the statement regarding the black officer who was made to wait outside O'Connor's office was correct. Finally, Davis testified that she had heard Lee referred to as "Hitler" by employees prior to Cox's conversation with Creighton.

Creighton was subpoenaed, but refused to testify under a "shield law" for newscasters. However, she signed a letter, which was entered into evidence, stating that Cox spoke with her at her request, that he responded to questions posed by her, and that he expressed his personal opinions regarding various subjects instead of expressing statements of fact.

On a vote of 2 to 1, the Commission voted to uphold the employment termination decision. Alleging in part that there was insufficient evidence to support his termination of employment and that the termination violated his First Amendment rights, Cox appealed via a petition in error to the district court. The district court, without discussing the First Amendment issue in its order, found the Commission's decision was supported by sufficient evidence and affirmed. Cox appeals.

## ASSIGNMENTS OF ERROR

Cox assigns, rephrased, that the district court erred in affirming the employment termination decision of the Commission on the basis that the decision was (1) in violation of his constitutional right to freedom of speech; (2) unsupported by fact or law because there was a lack of competent evidence that Cox knowingly made false or malicious statements with the intent to destroy the reputation, authority, or official standing of any individuals; (3) motivated by political agenda; and (4) in violation of his right to due process.

## STANDARD OF REVIEW

In reviewing an administrative agency decision on a petition in error, both the district court and the appellate court review the decision of the administrative agency to determine whether the agency acted within its jurisdiction and whether the decision of the agency is supported by sufficient relevant evidence. *Ashby v. Civil Serv. Comm.*, 241 Neb. 988, 492 N.W.2d 849 (1992). The reviewing court in an error proceeding is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact. *Id.*

The inquiry into whether a terminated employee's speech is protected under the First Amendment is a question of law. *Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir. 1989), citing *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Susan H. v. Keith L., ante* p. 322, 609 N.W.2d 659 (2000); *Turner v. Fehrs Neb. Tractor & Equip., ante* p. 313, 609 N.W.2d 652 (2000).

## ANALYSIS

Cox contends that his termination of employment violated his constitutionally protected interest in freedom of speech under the First Amendment. The Department contends that Cox's termination of employment was not in violation of the First Amendment on the basis that Cox was not speaking on matters of public concern and his statements had the potential to cause serious disruption within the correctional center.

It is clear that the government cannot condition public employment on a basis that infringes on the employee's constitutionally protected interest in freedom of expression. *Vinci v. Nebraska Dept. of Corr. Servs.*, 253 Neb. 423, 571 N.W.2d 53 (1997), citing *Connick v. Myers, supra.* The government's interests as an employer, however, in regulating the speech of its employees " ' "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." ' " *Vinci v. Nebraska Dept. of Corr. Servs.*, 253 Neb. at 431, 571 N.W.2d at 59, quoting *Connick v. Myers, supra*, and

*Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).

The threshold question in a determination of whether the First Amendment applies to a government employee's statement is whether the statement constitutes speech regarding a matter of public concern. See, *Rankin v. McPherson*, 483 U.S. 378, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987); *Vinci v. Nebraska Dept. of Corr. Servs., supra*; *Wood v. Tesch*, 222 Neb. 654, 386 N.W.2d 436 (1986), *overruled on other grounds, Landon v. Pettijohn*, 231 Neb. 837, 438 N.W.2d 757 (1989). If the statement does not involve a matter of public concern, the First Amendment does not apply, and the inquiry ends. *Id.* But if the statement does involve a matter of public concern, we must then balance the employee's interest in making the statement against the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. *Id.*

If it is determined that the speech in question is constitutionally protected, the plaintiff must then prove that the speech was a substantial or motivating factor in the employment decision. *Wulf v. City of Wichita, supra*, citing *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). The burden then shifts to the defendant to show by a preponderance of the evidence that it would have reached the same decision in the absence of the protected activity. *Id.*

### PUBLIC CONCERN

Cox contends that allegations of racism within the correctional center are matters of public concern. However, the Department, relying heavily on our decision in *Vinci v. Nebraska Dept. of Corr. Servs., supra*, contends that Cox was speaking only about matters internal to the correctional center.

"To fall within the realm of 'public concern,' an employee's speech must relate to a 'matter of political, social, or other concern to the community.'" *Morris v. Crow*, 117 F.3d 449, 456 (11th Cir. 1997), quoting *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). The public concern test functions to prevent every employee's grievance from becoming a constitutional case and to protect a public

employee's right as a citizen to speak on issues of concern to the community. *Vinci v. Nebraska Dept. of Corr. Servs.*, 253 Neb. 423, 571 N.W.2d 53 (1997), citing *Connick v. Myers, supra*; *Tindle v. Caudell*, 56 F.3d 966 (8th Cir. 1995). Whether an employee's statement is a matter of public concern is determined by its content, form, and context, as revealed by the entire record. *Vinci v. Nebraska Dept. of Corr. Servs., supra*, citing *Rankin v. McPherson, supra*. We have stated that whether an employee intends to disseminate a statement's content to the public and the employee's motivation in making the statement are important factors in the content, form, and context analysis. *Vinci v. Nebraska Dept. of Corr. Servs., supra*.

 An employee's statement concerning an internal grievance is not generally considered to be a matter of public concern. See, e.g., *Connick v. Myers, supra*. For example, in *Vinci v. Nebraska Dept. of Corr. Servs., supra*, an employee of the Nebraska Department of Correctional Services was disciplined after using racially and sexually offensive language to refer to other employees of the department. We noted that the employee was not attempting to stimulate public dialog regarding a matter of public concern, but was simply referring to his supervisor using an inflammatory and offensive slur. Further, the employee was not attempting to disseminate the statement's content to the public. Thus, we concluded that the First Amendment did not protect the employee from discipline. But courts have consistently stated that employee statements alleging racial discrimination within a public agency are inherently matters of public concern. See, e.g., *Connick v. Myers, supra*; *Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000); *Victor v. McElveen*, 150 F.3d 451 (5th Cir. 1998); *Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996); *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988); *Leonard v. City of Columbus*, 705 F.2d 1299 (11th Cir. 1983); *Kemp v. State Bd. of Agriculture*, 803 P.2d 498 (Colo. 1990); *Indiana Dept. of Highways v. Dixon*, 541 N.E.2d 877 (Ind. 1989).

In this case, Cox's statements touched on matters of public concern. The statements all related to allegations of problems of racial discrimination and tension at the correctional center. Although Cox did not give Creighton permission to further pub-

licize his statements, the fact that they were made to a reporter investigating the issue shows an intent on Cox's part to disseminate the statement's content to the public. Certainly, Creighton could have used Cox's statements to further her investigation, whether she had permission to directly quote him or not.

The Department's reliance on *Vinci v. Nebraska Dept. of Corr. Servs., supra,* is misplaced. Unlike *Vinci,* Cox was not expressing a personal dissatisfaction with his supervisors which was of no concern to the public at large. Rather, Cox was speaking to a reporter and candidly answering her questions regarding concerns of racial discrimination at the correctional center. See *Barrett v. University of Colorado,* 851 P.2d 258 (Colo. App. 1993) (distinguishing between statements that merely reflect racial bias of speaker and statements alleging racial discrimination). The fact that the news media was interested in the allegation of potential racism at the correctional center and was actively seeking information from Cox about it further indicates the public concern regarding the matter. See, generally, *Auriemma v. Rice,* 910 F.2d 1449 (7th Cir. 1990) (subject matter of speech was covered by newspaper). The case law clearly recognizes that allegations of racism in a public agency are of concern to the community at large.

The Department argues that Cox's statements were false or malicious and made with the intent to harm or destroy the reputation, authority, or official standing of individuals or organizations. Therefore, the Department contends that First Amendment protection is precluded. It has been suggested that a public employee might lose the protection of the First Amendment for knowingly or recklessly making false statements. *Pickering v. Board of Education,* 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). We may assume that false statements deliberately or recklessly made by public employees are either unprotected by the First Amendment or, at least, would weigh heavily against protection. See *Pickering v. Board of Education, supra; Moore v. City of Wynnewood,* 57 F.3d 924 (10th Cir. 1995). However, this does not alter our conclusion. In this case, the Department has failed to show that Cox made the statements knowing they were false or with reckless disregard for their veracity. For a statement to be malicious or recklessly

false, it must be more than negligently erroneous, and we consider the speaker's actual state of mind instead of an objective analysis of what a reasonably prudent person would have said. See *Brasslett v. Cota*, 761 F.2d 827 (1st Cir. 1985). Further, erroneous statements of public concern will be protected unless they are shown to have interfered with the employee's performance or the regular operation of his or her governmental agency. *Brasslett v. Cota, supra*, citing *Pickering v. Board of Education, supra*.

In this case, the record is clear that Cox believed his statements to be true, was merely expressing his personal opinions, and had reason to believe that the facts behind his expressions of opinion were correct. Thus, even if we assume the possibility that one or more of Cox's statements could be false, a factual issue we need not decide, and could be interpreted to have been made in a manner that exhibited an intent to harm the reputation of others, we do not find support in the record that any such statements were made in a recklessly false or malicious manner so as to preclude First Amendment protection. See *Wulf v. City of Wichita*, 883 F.3d 842 (10th Cir. 1989) (employee's statements of employer misconduct based on his own suspicions were not recklessly or maliciously false and were matters of public concern). We conclude that Cox's statements were in regard to matters of public concern and subject to First Amendment protection.

## BALANCING

Because Cox's statements involved matters of public concern, we must next address the more difficult task of balancing Cox's First Amendment interest in making the statement against the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. Cox contends that the balance is in his favor, particularly because he had permission to speak with Creighton. The Department contends that the balance is in its favor because Cox's statements had the potential to disrupt the workplace and cause undue violence at the correctional center.

 In balancing an employee's and an employer's competing interests, the Eighth Circuit Court of Appeals has consid-

ered six interrelated factors: (1) the need for harmony in the office or workplace; (2) whether the government's responsibilities require a close working relationship to exist between a plaintiff and his or her coworkers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties. *Shands v. City of Kennett*, 993 F.2d 1337 (8th Cir. 1993). The balance is flexible, and the weight to be given to any one factor depends upon the specific circumstances of each case. *Id.*

When close working relationships are essential to fulfill public responsibilities, a wide degree of deference to the employer's judgment is appropriate. *Wood v. Tesch*, 222 Neb. 654, 386 N.W.2d 436 (1986), citing *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Thus, police organizations have generally been given additional deference when balancing an employee's speech regarding a matter of public concern against the need of the employer to prevent disruption in the workforce. See *Shands v. City of Kennett, supra.* It has been said that it is not necessary for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships are manifest before taking action. *Id.* However, purely speculative allegations of workplace disruption are insufficient as a basis for disciplining an employee based on his or her statements regarding matters of public concern. *Wulf v. City of Wichita, supra.* In addition, the more substantially involved in matters of public concern is an employee's speech, the stronger must be an employer's showing as to the disruptive effect upon close working relationships and efficiency. *Id.* See, also, *Powell v. Gallentine*, 992 F.2d 1088, 1091 (10th Cir. 1993) ("'an employee's First Amendment interest is entitled to greater weight where he is acting as a whistle blower in exposing government corruption'").

The Department's evidence focuses on the contention that the allegations of racial discrimination stated by Cox had the potential to disrupt the workplace and jeopardize the safety of inmates and employees. Evidence was also presented that

Cox went outside the chain of command when making the statements. These are considerations that weigh in favor of the Department's ability to terminate Cox's employment even though his speech regarded matters of public concern. The record indicates, however, that no disruption actually occurred and that Cox specifically sought to limit any possible disruption his statements might have. Cox specifically stated to Creighton that he did not want his comments published and that he refused to appear on television. In addition, although the Department has an interest in seeing that grievances are addressed through a chain of command, the fact that an employee moved quietly and did not attempt to provoke a public confrontation lessens the weight given to the employer on this factor. See *Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996). See, also, *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988) (discussing disruption in workplace in regard to employee interview with reporter and noting that employee did not seek out interview but was instead contacted by reporter). Further, the record indicates that Cox's statements concerned issues that were already a topic of discussion and concern within the correctional center before he spoke with Creighton. Thus, any potential disruption would not be caused solely by Cox's statements. See *Wulf v. City of Wichita*, 832 F.3d 842 (10th Cir. 1989) (discussing similar situation).

 Of particular importance is the context in which Cox made his statements. Cox repeatedly sought and was granted permission to speak to Creighton about anything except the inmates. Cox was responding to Creighton's call, and there is no indication that he knew what Creighton was going to ask him. By providing Cox with permission to discuss anything other than the inmates with Creighton, it was the actions of the Department itself that left open the possibility of workplace disruption. These circumstances weigh heavily against the Department's ability to terminate Cox's employment based on his statements to Creighton. See, *Victor v. McElveen*, 150 F.3d 451 (5th Cir. 1998) (fact that employee made statement critical of his employer after receiving express permission to comment freely weighed heavily in employee's favor); *Bickel v. Burkhart*, 632 F.2d 1251 (5th Cir. 1980) (context factor weighed in favor

of employees who complained at meeting following statement by administrator that they could talk about anything that was on their minds). In addition, there is no evidence that Cox's statements impaired his ability to perform his duties, and as previously discussed, the statements were in regard to matters that are commonly referred to as "inherently" matters of public concern. See *Connick v. Myers, supra.* See, also, *Victor v. McElveen, supra* (indicating that public interest in prevention and elimination of racial discrimination outweighs employer's interest in preventing disruption in workplace). In balancing the interests of each party, we think that Cox's First Amendment interest in making the statements trumps the Department's interest as an employer concerned with the efficiency of the public services it performs. Thus, we determine that the Department could not terminate Cox's employment on the basis of his statements to Creighton. There is no evidence in the record that the Department would have terminated Cox's employment on any other basis. Accordingly, we reverse.

 Cox has moved this court for an award of attorney fees on appeal pursuant to Neb. Rev. Stat. § 25-824 (Reissue 1995) on the basis that the legal position of the Department is frivolous. An appellate court may award attorney fees on appeal regardless of whether they were requested or ordered in the trial court. *Schuelke v. Wilson,* 255 Neb. 726, 587 N.W.2d 369 (1998); *Foiles v. Midwest Street Rod Assn. of Omaha,* 254 Neb. 552, 578 N.W.2d 418 (1998). For purposes of § 25-824, "frivolous" means an attempt to relitigate the same issues resolved in prior proceedings with the same parties or a legal position wholly without merit, that is, without rational argument based on law and evidence to support a litigant's position. Any doubt as to whether a legal position is frivolous should be resolved in favor of the party whose legal position is in question. We conclude that the Department's approach to the disciplinary proceedings and the appeal were not frivolous. Thus, Cox's motion for attorney fees on appeal is denied.

## CONCLUSION

We conclude that Cox's statements were in regard to matters of public concern and that his interest in making those state-

ments outweighed the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. As a result, we conclude that the termination of Cox's employment violated his constitutionally protected interest in freedom of speech. The district court erred in affirming the decision of the Commission. Accordingly, we reverse. Because we reverse based on Cox's first assignment of error, we do not address the remaining assignments of error.

REVERSED.

MCCORMACK, J., not participating.