cancel the notice of lis pendens. If time for appeal remains, the merits of the underlying action affecting the title to real property are not relevant to whether good cause to cancel a notice of lis pendens exists. Nor does the existence of a prospective purchaser of the subject property amount to good cause. Accordingly, we reverse the district court's order canceling Kelliher's notice of lis pendens.

REVERSED.

CASSEL, J., not participating.

————————

DAVID BROCK, APPELLANT, V. TIM DUNNING, SHERIFF, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, AND DOUGLAS COUNTY, A POLITICAL SUBDIVISION, APPELLEES.

___ N.W.2d ___

Filed August 29, 2014.    No. S-13-647.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Summary Judgment: Proof.** The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law.

4. **Summary Judgment: Evidence: Proof.** After the movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence was uncontroverted at trial, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion.

5. **Summary Judgment.** In the summary judgment context, a fact is material only if it would affect the outcome of the case.

6. ____. Summary judgment proceedings do not resolve factual issues, but instead determine whether there is a material issue of fact in dispute.

7. ____. If a genuine issue of fact exists, summary judgment may not properly be entered.

8. **Political Subdivisions Tort Claims Act.** The Political Subdivisions Tort Claims Act is the exclusive means by which a tort claim may be maintained against a political subdivision or its employees.

9. **Constitutional Law: Actions.** In any 42 U.S.C. § 1983 (2012) action, the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

10. **Constitutional Law: Property.** The 14th Amendment's protection of property extends to benefits for which, under state law or practice, a person has a claim or entitlement.

11. **Constitutional Law: Public Officers and Employees.** The content, form, and context of a given statement must be considered in determining whether an employee's speech addresses a matter of public concern.

12. ____: ____. To fall within the realm of public concern, an employee's speech must relate to a matter of political, social, or other concern to the community.

13. ____: ____. The public concern test functions to prevent every employee's grievance from becoming a constitutional case and to protect a public employee's right as a citizen to speak on issues of concern to the community.

14. ____: ____. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

15. ____: ____. Factors relevant in determining whether an employee's speech undermines the effective functioning of the public employer's enterprise are whether the speech creates disharmony in the workplace, impedes the speaker's ability to perform his or her duties, or impairs working relationships with other employees.

16. **Constitutional Law: Due Process.** The Due Process Clause of the 14th Amendment contains a substantive component that provides some protection to a person's right of privacy.

Appeal from the District Court for Douglas County: W. Mark Ashford, Judge. Affirmed.

Bruce G. Mason, of Mason Law Office, for appellant.

Donald W. Kleine, Douglas County Attorney, and Bernard J. Monbouquette for appellees.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Miller-Lerman, J.

## NATURE OF CASE

David Brock, the appellant, was employed as a deputy sheriff with the Douglas County sheriff's office (Sheriff's Office). In March 2007, Brock was injured while on duty, and he filed a workers' compensation claim. While receiving workers' compensation benefits, Brock periodically was placed under surveillance. Eventually, the Sheriff's Office determined that Brock had been untruthful regarding the extent of his injuries with medical personnel, workers' compensation personnel, and personnel within the Sheriff's Office. Accordingly, Brock's employment was terminated on June 10, 2009. By a letter dated August 23, 2010, the Douglas County Sheriff's Merit Commission (Merit Commission) stated that it affirmed the termination. The district court for Douglas County affirmed the Merit Commission's decision on December 30. This previous action is not the case before us.

On December 23, 2010, Brock filed his petition in the district court for Douglas County against Tim Dunning, individually and in his official capacity as Douglas County Sheriff, and Douglas County, the appellees, alleging two causes of action. This case gives rise to the instant appeal. The first cause of action was a claim of wrongful discharge in retaliation for having filed and pursued a workers' compensation claim. The second cause of action was brought under 42 U.S.C. § 1983 (2012), and alleged three theories. The appellees filed their answer on January 27, 2011, generally denying Brock's allegations. On August 31, 2012, the appellees filed a motion for summary judgment. After a hearing, the district court filed an order on July 5, 2013, in which it determined there were no issues of material fact and granted the appellees' motion for summary judgment. Brock appeals. We find no merit to Brock's assignments of error on appeal, and we therefore affirm the district court's order.

## STATEMENT OF FACTS

Brock began his employment as a deputy sheriff with the Sheriff's Office in 1995. From 2001 to 2004, Brock was assigned to the K-9 unit involved in drug interdiction along

Interstate 80. The Sheriff's Office received significant income from the property seizures by the K-9 unit's drug interdiction along the interstate. Brock believed that he had observed racial profiling of drivers by Edward Van Buren, the sergeant in charge of the K-9 unit. On two occasions between October 2001 and April 2004, Brock and three other deputies reported their concerns of racial profiling to Chief Deputy Marty Bilek and other command officers of the Sheriff's Office. In April 2004, Brock was reassigned to road patrol for disciplinary reasons; two of the other reporting deputies were asked to leave the K-9 unit due to "burn out."

On March 18, 2007, Brock sustained injuries to his neck and shoulder when struggling with a suspect while on duty. Brock filed a claim for workers' compensation benefits. Brock asserts that the Sheriff's Office consistently delayed or refused his needed medical care. Once authorized, MRI's revealed disk herniation and a rotator cuff tear. Brock eventually underwent five surgeries and attended physical therapy due to his injuries.

As early as May 2007, Janice Johnson, who was employed by Douglas County and was responsible for administering the workers' compensation claims of Douglas County employees, hired private investigators to periodically place Brock under surveillance and to report on Brock's physical abilities. Between May 2007 and June 2008, Brock was under surveillance on approximately 10 different days for approximately 73 hours.

By February 13, 2009, Brock was released by his doctor to return to light duty for 4 hours per day at the Sheriff's Office. From February 13 through 16, Brock was again placed under surveillance. Including the most recent surveillance, Brock was under surveillance for a total of approximately 100 hours from May 2007 through February 2009. On February 13, an investigator videotaped Brock while he was operating his pickup truck with a snowplow attached to it for 5 hours. During that time, Brock was clearing snow from business parking lots for his father's lawn maintenance and snow removal business.

On March 17, 2009, Brock met with Dr. Kirk S. Hutton, one of his treating physicians. Prior to that appointment, Dr. Hutton had viewed the surveillance film from February 13. Dr. Hutton characterized the film as showing Brock's rotating the steering wheel and twisting his neck to see behind him. During the examination on March 17, Dr. Hutton asked Brock about the range of activities that Brock could perform and specifically asked Brock whether he could operate a snowplow. Brock responded that there was "no way" he could drive a truck or operate a snowplow. Dr. Hutton's notes from the March 17 examination state:

I should also mention that I reviewed a surveillance video taken of [Brock] in February operating a snow plow and a pick-up truck. He was driving using his left hand extensively rotating the wheel, turning around watching behind him, twisting his neck with no apparent problems using his left arm. I did question him about activities that he has been able to do. We got on the topic of scooping snow and running a snow plow. When I asked him if he could do this he said there was no way that he could even drive a truck or work a snow plow.

On March 26, 2009, Brock completed a functional capacity evaluation (FCE). The physical therapist who conducted the FCE sent a letter to Johnson regarding the results. The physical therapist indicated that Brock had "self-limited several of the lifting tasks." The physical therapist defined self-limiting behavior as "stopp[ing] the activity prior to objective signs consistent with maximal effort being demonstrated." The physical therapist stated that he could not complete an accurate assessment of Brock's physical abilities due to this self-limiting behavior.

After these reports, in April 2009, an internal investigation regarding Brock's activities commenced. A lieutenant from the Sheriff's Office conducted the internal investigation, which included an interview with Brock. During the interview, Brock at first denied any involvement with his father's business, but once he was shown documentation of his involvement and work for the business, he admitted that he owned stock and

participated in the business. Brock thereafter admitted to the lieutenant that he had operated the pickup truck with the snowplow attached to it on February 13.

After the internal investigation, on May 29, 2009, Brock was provided notice of a predisciplinary hearing. The notice for the predisciplinary hearing contained three instances where the Sheriff's Office believed that Brock had been untruthful and referenced various General Orders of the Sheriff's Office that the Sheriff's Office believed Brock had violated. The predisciplinary hearing was held on June 8, and Brock appeared with his union representative.

Following the hearing, Brock's employment was terminated on June 10, 2009. He was provided written notice of the termination, which indicated that the termination was due to his being "untruthful and deceptive when interacting with doctors, Workers Comp [sic] personnel and a Sheriff's Internal Affairs investigator."

After Brock's employment was terminated, he exercised his statutory right to appeal the termination to the Merit Commission. A hearing was held before the Merit Commission, and by a letter dated August 23, 2010, the Merit Commission stated that it had unanimously voted, 5 to 0, to affirm Brock's termination of employment.

Brock then appealed the decision of the Merit Commission to the district court for Douglas County in case No. CI 10-9391145. The district court filed an order on December 30, 2010, affirming the decision of the Merit Commission. The district court determined, inter alia, that the record of the Merit Commission's proceeding included sufficient evidence to support the termination and that there was no evidence to support Brock's allegation that his due process rights were violated. Brock did not appeal the December 30 order of the district court in the prior action.

On December 23, 2010, Brock filed his petition in this case, in which he alleged two causes of action. Dunning was sued as a defendant in his official and individual capacities. Douglas County was also sued as a defendant. These defendants are the appellees. With respect to his first cause of action, Brock alleged that the appellees wrongfully terminated

his employment in retaliation for having filed and pursued a workers' compensation claim. Brock's second cause of action, based on § 1983, alleged three theories of liability. First, Brock alleged that the appellees had a policy or custom of obstructing, delaying, and denying receipt of workers' compensation benefits in violation of his protected property interests. Second, Brock alleged that the appellees retaliated against him by terminating his employment for exercising his right of free speech under the First Amendment when he reported racial profiling. Third, Brock alleged that the appellees violated his right to privacy when he was placed under surveillance.

On January 27, 2011, the appellees filed their answer generally denying Brock's allegations. The appellees raised as a defense that Brock "has failed to state a claim against the [appellees] upon which relief can be granted for his First and Second Causes of Action." No affirmative defense of immunity was pled.

On August 31, 2012, the appellees filed a motion for summary judgment. A hearing was held on the motion on January 22, 2013. At the hearing, the appellees offered and the court received 15 exhibits, including documents and the transcript of the proceedings before the Merit Commission, the district court's order affirming the decision of the Merit Commission in the previous case, the depositions of Brock and Johnson, the affidavits of Dunning and Johnson, medical reports, investigation reports, internal communications, the notice and transcript of the prediscipline hearing, and the notification of Brock's termination of employment. Brock offered and the court received three exhibits, including the depositions of Brock, Dunning, and a former deputy, Matthew L. Murphy, the latter of whom testified about having reported witnessing racial profiling by Van Buren, the sergeant in charge of the K-9 unit, to Bilek.

On July 5, 2013, the district court filed its order granting the appellees' motion for summary judgment and dismissing Brock's petition. With respect to the first cause of action regarding retaliatory discharge due to Brock's having filed a claim for workers' compensation, the district court determined,

inter alia, that Brock's wrongful termination action, a tort, was barred for failure to make a claim. The court noted that both the appellees, Dunning and Douglas County, are political subdivisions of the State of Nebraska, or an elected official of the same, and that they are therefore subject to the provisions of Nebraska's Political Subdivisions Tort Claims Act. Because Brock's termination of employment occurred on June 10, 2009, the court stated that Brock was required to file a notice of claim of an action arising in a tort by June 10, 2010. The court determined that Brock had failed to plead and prove that he had complied with the 1-year notice of claim requirement under Neb. Rev. Stat. § 13-919(1) (Reissue 2012) of the Political Subdivisions Tort Claims Act. Therefore, the district court granted summary judgment in favor of the appellees on the first cause of action.

With respect to Brock's second cause of action, the district court stated that it "is based in . . . § 1983, and has three separate and distinct theories of liability." Brock's first theory was that the appellees "had an official custom, practice and officially adopted policy to delay, hinder, obstruct, and deny [Brock] his federally protected property entitlement in obstructing, delaying, denying and finally terminating [Brock's employment] for exercising his right to receive the Nebraska statutory program of workers' compensation benefits." The district court stated that a plaintiff must prove the following in order for there to be liability under § 1983: "1. a constitutional violation, or a federal law violation, 2. which was committed by a person acting under the color of state law, and 3. with proximate causation between the actor and the constitutional/legal deprivation." The district court determined that there was "no official policy, and no continuing widespread, persistent custom or practice by the [appellees] to terminate the employment of injured employees including [Brock] who claim and/or receive workers' compensation benefits," and that therefore, Brock failed to prove a constitutional or law violation.

Brock's second theory under § 1983 alleged that the appellees retaliated against him for exercising his First Amendment

right to freedom of speech when he reported racial profiling by the K-9 unit staff. The court determined that Brock's speech was not protected because he had spoken in his official capacity as an employee about official practices, not as a private citizen. Additionally, the court determined that Brock's 2009 termination of employment was not in retaliation for speech made in 2004 or 2005 because the alleged retaliatory action was too remote in time as a matter of law.

Brock's third theory under § 1983 alleged that the appellees violated his right to privacy based on the surveillance by investigators authorized by Johnson. The court analyzed this issue under the 4th Amendment, not the 14th Amendment, and determined that the use of private investigators was routine "in the industry" and that Brock had no expectation of privacy in the business parking lots where he was recorded plowing snow.

Based on the foregoing reasons, the district court determined that there were no genuine issues as to any material facts presented by the parties and that the appellees were entitled to judgment as a matter of law. The court granted the appellees' motion for summary judgment and dismissed Brock's petition.

Brock appeals.

## ASSIGNMENTS OF ERROR

Brock claims that the district court erred when it granted summary judgment in favor of the appellees and dismissed Brock's petition. Brock's numerous contentions regarding each cause of action and each theory under § 1983 are addressed individually in our analysis below.

## STANDARDS OF REVIEW

[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014).

[2] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id*.

## ANALYSIS

In this case, Brock appeals from the district court's order granting summary judgment in favor of the appellees. Thus, as a preliminary matter, we set forth the legal principles applicable to a motion for summary judgment.

[3-7] The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Latzel v. Bartek, ante* p. 1, 846 N.W.2d 153 (2014). After the movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence was uncontroverted at trial, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion. *Id*. In the summary judgment context, a fact is material only if it would affect the outcome of the case. *Id*. Summary judgment proceedings do not resolve factual issues, but instead determine whether there is a material issue of fact in dispute. *Id*. If a genuine issue of fact exists, summary judgment may not properly be entered. *Id*.

*First Cause of Action: Tort of Wrongful*
*Discharge in Retaliation for Filing a*
*Workers' Compensation Claim.*

At the core of his first cause of action, Brock alleged that he was wrongfully discharged by the appellees in retaliation for filing a workers' compensation claim. The district court determined that Brock had failed to plead and the evidence did not suggest that he had filed written notice of his claim within 1 year of the alleged tortious act, as required by § 13-919(1) of the Political Subdivisions Tort Claims Act, and

entered summary judgment in favor of the appellees on this cause of action for this reason. Brock claims that the district court erred when it so ruled. We find no merit to this assignment of error.

In *Jackson v. Morris Communications Corp.*, 265 Neb. 423, 657 N.W.2d 634 (2003), we determined that an employee may bring a common-law tort action when an employer wrongfully discharges the employee in retaliation for filing a workers' compensation claim. See, also, *Trosper v. Bag 'N Save*, 273 Neb. 855, 734 N.W.2d 704 (2007); *Riesen v. Irwin Indus. Tool Co.*, 272 Neb. 41, 717 N.W.2d 907 (2006). Thus, Brock's first cause of action is a tort claim.

[8] Brock brought his cause of action for wrongful discharge in retaliation for filing a workers' compensation claim against Douglas County and Dunning, an elected official of Douglas County, the appellees. Both of the appellees are subject to the provisions of the Political Subdivisions Tort Claims Act. The Political Subdivisions Tort Claims Act is the exclusive means by which a tort claim may be maintained against a political subdivision or its employees. *Keller v. Tavarone*, 265 Neb. 236, 655 N.W.2d 899 (2003). Section 13-919(1) of the Political Subdivisions Tort Claims Act provides in relevant part that "[e]very claim against a political subdivision permitted under the Political Subdivisions Tort Claims Act shall be forever barred unless within one year after such claim accrued the claim is made in writing to the governing body."

Brock was terminated from his employment on June 10, 2009. Brock's claim of retaliatory discharge accrued on this date. Thus, under § 13-919(1), Brock was required to make his claim in writing within 1 year after June 10, 2009, otherwise his claim was barred. As demonstrated by the appellees, Brock did not allege in his petition or otherwise assert that he made the claim within the 1-year period. Brock did not present evidence which would indicate that he made such a claim. Because Brock failed to show that he provided written notice of his tort action for wrongful discharge in retaliation for filing a workers' compensation claim within 1 year of his termination of employment, the appellees were entitled to

summary judgment on this issue. The district court did not err when it determined that the claim is barred under § 13-919(1) and entered summary judgment in favor of the appellees on the first cause of action.

*Second Cause of Action: § 1983.*

[9] In the "Second Cause of Action" in his petition, Brock alleged three theories, each of which he alleges were violations of the provisions of § 1983. Thus, we set forth some basic principles concerning § 1983 applicable to each theory.

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit at equity, or other proper proceeding for redress . . . .

Section 1983 provides "a civil remedy for 'deprivations of federally protected rights,' statutory or constitutional, 'caused by persons acting under color of state law.'" *Amanda C. v. Case*, 275 Neb. 757, 765, 749 N.W.2d 429, 437 (2008), quoting *Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986).

We have previously stated that

> "[i]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."

*Amanda C. v. Case*, 275 Neb. at 765-66, 749 N.W.2d at 437, quoting *Parratt v. Taylor, supra*. The second element requires a plaintiff to prove not only a deprivation of a right, but also that the defendant's conduct was a cause in fact of the alleged deprivation. *Soto v. Flores*, 103 F.3d 1056 (1st Cir.

1997), *cert. denied* 522 U.S. 819, 118 S. Ct. 71, 139 L. Ed. 32 (1997).

In this case, it is not disputed that the appellees were acting under color of state law, and Brock makes no argument that Dunning should be individually liable. We treat the allegations against Dunning individually as abandoned. Given the foregoing, as to each of the theories, we focus on the second element regarding whether the appellees' conduct deprived Brock of his rights, privileges, or immunities secured by law and whether the appellees' conduct was a cause in fact of the alleged deprivation.

*Second Cause of Action Under § 1983,*
*First Theory: Deprivation*
*of Property Rights.*

In his first theory under § 1983, Brock alleged a deprivation of property rights under the 14th Amendment. As to this theory, Brock claims that the district court erred when it determined that the evidence failed to show and there was no inference that the appellees had an official policy, practice, or custom of obstructing, delaying, and denying workers' compensation benefits and entered summary judgment in favor of the appellees on this theory. We find no merit to this assignment of error.

[10] We have stated that the 14th Amendment's protection of property extends to benefits for which, under state law or practice, a person has a claim or entitlement. *Braesch v. DePasquale*, 200 Neb. 726, 265 N.W.2d 842 (1978). The U.S. Supreme Court has stated that

> [p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).

Pursuant to the Nebraska Workers' Compensation Act, Brock was entitled to workers' compensation benefits and,

therefore, he had a property interest in his workers' compensation benefits. Given this entitlement, the 14th Amendment is implicated.

Referring to the U.S. Supreme Court's interpretation of § 1983, we have observed that a municipality is not liable for the acts of its employees when those acts do not represent the official policy or custom of the municipality. See *Manning v. Dakota Cty. Sch. Dist.*, 279 Neb. 740, 782 N.W.2d 1 (2010). See, also, *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). In *Manning*, we stated:

> A rigorous standard of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees. The U.S. Supreme Court elaborated that Congress did not intend municipalities to be held liable unless action pursuant to "official municipal policy of some nature caused a constitutional tort." In other words, a municipality is liable only when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury.

*Manning v. Dakota Cty. Sch. Dist.*, 279 Neb. at 748-49, 782 N.W.2d at 9, quoting *Monell v. New York City Dept. of Social Services, supra*. Because Brock has alleged a deprivation pursuant to a "policy" or "custom," we explain those terms.

Policy is made when a decisionmaker, possessing final authority to establish municipal policy with respect to the action, issues an official proclamation, policy, or edict. *Manning v. Dakota Cty. Sch. Dist., supra*. "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. Cincinnati*, 475 U.S. at 481-82. Rather, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or

officials responsible for establishing final policy with respect to the subject matter in question." U.S. at 483-84.

A custom is proved by demonstrating that a given course of conduct, although not specifically endorsed or authorized by state or local law, is so well settled and permanent as virtually to constitute law. *Manning v. Dakota Cty. Sch. Dist., supra.*

In support of the appellees' motion for summary judgment on this theory, they presented evidence, including the deposition of Johnson, demonstrating how workers' compensation claims made by Douglas County employees are processed. The evidence showed the processing of claims in a conventional manner, and nothing in the evidence suggested a deliberate policy or custom designed to deprive Brock or others of workers' compensation benefits.

Brock presented no evidence to indicate that there have been instances of the obstruction, delay, or denial of other Douglas County employees' workers' compensation benefits, so as to constitute or infer a policy or custom. As to his own claim, Brock points to the delay in having an MRI and seeing an orthopedic specialist and the delay in receiving a second opinion regarding his pain and injuries as evidence of a policy or custom of the appellees. While the medical personnel may have been slow to correctly diagnose Brock's injuries, this does not constitute a showing or inference that the appellees had a policy or custom fostering delay so as to frustrate benefits. Further, although the record shows that while Johnson, an employee and agent of Douglas County, had some discretion regarding the handling of workers' compensation claims and benefits for Douglas County employees, she did not have the authority to establish final policy for Douglas County. Thus, Johnson's case-by-case decisions regarding administering the workers' compensation claims of injured Douglas County employees and approving medical treatment does not demonstrate a § 1983 violation.

For completeness, we note that to the extent that Brock contends the appellees had a policy or custom to terminate the employment of employees of Douglas County in retaliation for seeking workers' compensation claims, the evidence

fails to support inferences of this claim. The evidence presented by the appellees showed that Johnson has discretion in handling workers' compensation claims and that there is no policy or custom of terminating the employment of employees in retaliation for seeking such benefits. Brock did not present any evidence showing or inferring the existence of a policy or custom of terminating the employment of employees for filing workers' compensation claims, and he has not presented evidence of any other Douglas County employees whose employment has been terminated due to filing workers' compensation claims.

Even viewing the evidence in the light most favorable to Brock, there is no evidence of an official policy or custom to obstruct, delay, or deny Douglas County employees' workers' compensation benefits to which they were entitled or a policy or custom of terminating employees' employment in retaliation for seeking workers' compensation benefits. The appellees demonstrated that they were entitled to judgment as a matter of law, and Brock did not present evidence precluding judgment. The district court did not err when it entered summary judgment in favor of the appellees on this theory.

*Second Cause of Action Under § 1983,*
*Second Theory: Protected*
*Speech Retaliation.*

In his second theory under § 1983, Brock alleged his employment was terminated in retaliation for exercising his First Amendment right to freedom of speech. As to this theory, Brock claims the district court erred when it determined that his reports of racial profiling by Van Buren, the supervisor of the K-9 unit, were not protected speech and that therefore, the appellees did not violate his First Amendment right to freedom of speech. Although our analysis differs from that of the district court, we find no merit to Brock's assignment of error in which he claims that the district court erred when it entered summary judgment in favor of the appellees on this theory.

As to the procedural posture of this case, the appellees moved for summary judgment. As set forth in greater detail

at the beginning of our analysis, ordinarily, the moving party must establish its entitlement to judgment and then the burden shifts to the nonmoving party to produce evidence showing the existence of a material issue of fact that prevents judgment. See *Latzel v. Bartek, ante* p. 1, 846 N.W.2d 153 (2014). On appeal, we view the evidence in the light most favorable to Brock as the nonmoving party and give him the benefit of all reasonable inferences deducible from the evidence. See *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014).

As to the substantive law applicable to this theory, we have stated that in order for a plaintiff to make a substantive prima facie case of protected speech retaliation, the plaintiff must prove two elements: first, that the statements are protected speech and, second, that the speech was a substantial or motivating factor in the employment decision. See *Cox v. Civil Serv. Comm. of Douglas Cty.*, 259 Neb. 1013, 614 N.W.2d 273 (2000). As to the first element, protected speech, the identification of such speech is itself a two-step process requiring proof: first, that the speech was made as a citizen addressing a matter of public concern, *Lane v. Franks*, ___ U.S. ___, 134 S. Ct. 2369, ___ L. Ed. 2d ___ (2014), and, second, that the interest of the plaintiff in so speaking, balanced against the interest of the public employer in promoting the efficiency of the public services it performs through its employees, favors the plaintiff, *Cox v. Civil Serv. Comm. of Douglas Cty., supra*.

If the plaintiff proves the first element, i.e., the speech is constitutionally protected, the plaintiff must then establish the second element, i.e., the protected speech was a substantial or motivating factor in the employment decision. *Id*.

If the plaintiff makes a prima facie case of protected speech retaliation as just described, the burden then shifts to the employer to show by a preponderance of the evidence that it would have reached the same decision in the absence of the protected activity. *Id*.

As the foregoing descriptions show, "burden-shifting" is present in this case in two separate respects: first, as to the summary judgment procedure and, second, as to the protected

speech retaliation substantive claim. Other courts have taken note of this phenomenon and described the path accommodating both burden-shifting principles.

In a First Amendment retaliation case where the defendant public employers moved for summary judgment, the U.S. Court of Appeals for the Sixth Circuit stated that the plaintiff must first make a prima facie case of retaliation, and

> [i]f the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir.2010) . . . . "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id*. Unlike in the *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),] burden-shifting framework [pertaining to employment discrimination], the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims.

*Dye v. Office of the Racing Com'n*, 702 F.3d 286, 294-95 (6th Cir. 2012).

Similar to the Sixth Circuit, we have sometimes referred to a hypothetical jury when discussing the summary judgment process. As to whether to enter summary judgment, we have stated in part that where the facts "are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the trial court to decide the question as a matter of law rather than submit it to the jury for determination." *Sweem v. American Fidelity Life Assurance Co.*, 274 Neb. 313, 319, 739 N.W.2d 442, 447 (2007). This does not mean that the standards for granting motions for summary judgment and motions for directed verdict are the same. The former focuses on individual facts or inferences, while the latter addresses the evidence as a whole at the time of the motion. With that caveat, we agree with the process mentioned by the Sixth Circuit, including the statement that the burden does not shift back to a plaintiff

in First Amendment retaliation claims. See *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). With the foregoing process in mind, we review the evidence.

[11-14] As stated above, to establish the first element, the plaintiff must show that he or she engaged in constitutionally protected speech or conduct, the first component of which is a showing that the speech addressed a matter of public concern. As to public concern, we recently stated:

> The content, form, and context of a given statement must be considered in determining whether an employee's speech addresses a matter of public concern. To fall within the realm of public concern, an employee's speech must relate to a matter of political, social, or other concern to the community. The public concern test functions to prevent every employee's grievance from becoming a constitutional case and to protect a public employee's right as a citizen to speak on issues of concern to the community. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

*Carney v. Miller*, 287 Neb. 400, 414, 842 N.W.2d 782, 795 (2014).

In this case, on two occasions between October 2001 and April 2004, Brock, along with three other deputies, met with commanding officers of the Sheriff's Office, including Bilek. At these meetings, Brock reported that he believed he had observed racial profiling by Van Buren, the sergeant in charge of the K-9 unit, while patrolling I-80. It has recently been observed that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, ___ U.S. ___, 134 S. Ct. 2369, 2379, ___ L. Ed. 2d ___ (2014). Nothing in the record indicates that it was part of Brock's duties to advise the agency of his concerns. It has also been observed that "[t]he inquiry into

whether a public employee is speaking pursuant to [his] official duties is not susceptible to a brightline rule." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012). "Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id*. Looking at the summary judgment record, Brock's reports were not part of his duties and can be fairly considered as citizen speech relating to a matter of concern to the community.

We have recognized that courts have consistently stated that employee statements alleging racial discrimination within a public agency are inherently matters of public concern and that allegations of racism in a public agency are of concern to the community at large. See *Cox v. Civil Serv. Comm. of Douglas Cty.*, 259 Neb. 1013, 614 N.W.2d 273 (2000) (collecting cases). We have also identified matters of public concern involving an agency's treatment of the public. Thus, in *Carney v. Miller, supra*, we recently determined that a public employee's complaints about allegedly wrongful cancellation of services to aid recipients was of interest to the community at large, not a matter of interest to the employee alone, and therefore a matter of public concern.

Racially discriminatory conduct by an agency toward the public, as distinguished from racially discriminatory conduct within the agency, has been considered by other courts and found to be a matter of public concern. More specifically, racial profiling of the public by a public law enforcement agency has been identified as a matter of public concern. E.g., *Smith v. County of Suffolk*, No. CV 10-1397(ARL), 2013 WL 752635 (E.D.N.Y. Feb. 27, 2013) (unpublished memorandum and order) (involving racial profiling concerning arrests for unlicensed drivers); *Nonnenmann v. City of New York*, No. 02 Civ. 10131 JSR AJP, 2004 WL 1119648 (S.D.N.Y. May 20, 2004) (unpublished report and recommendation) (involving racial profiling during stop and frisk). See, similarly, *Daniels v. City of New York*, 138 F. Supp. 2d 562, 565 (S.D.N.Y. 2001) (stating in non-First Amendment case that "[p]laintiffs are litigating a controversial matter of serious public concern, namely racial profiling"). As the U.S. Court of Appeals for the Second Circuit has noted:

The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias. . . . If the police department treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired.

*Pappas v. Giuliani*, 290 F.3d 143, 146-47 (2d Cir. 2002). Consistent with our analysis in *Cox*, *Carney*, and other authorities, we believe Brock's reports of his observations of racial profiling by his agency are of public concern.

[15] Because Brock's reports of racial profiling involved matters of public concern, in order to determine if the statements were protected speech, we must next balance Brock's First Amendment interest in making the statements against the interest of the public employer in "promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). In *Carney v. Miller*, 287 Neb. 400, 416, 842 N.W.2d 782, 796 (2014), we stated: "Factors relevant in determining whether an employee's speech undermines the effective functioning of the public employer's enterprise are whether the speech creates disharmony in the workplace, impedes the speaker's ability to perform his or her duties, or impairs working relationships with other employees."

We have reviewed the record for purposes of applying the balancing factors. There is no evidence in the record of disharmony in the workplace. There is no evidence that Brock's statements impaired his ability to perform his duties or impaired working relationships with other employees. In balancing the interests of the parties, we believe that Brock's First Amendment interest in making the statements outweighs the appellees' interest as employers where there is no evidence that the effective functioning of the public employer's enterprise

was affected. Thus, we determine that Brock's speech was protected by the First Amendment.

Because Brock's statements were protected speech, and because the appellees took an adverse employment action against Brock by terminating his employment, the next consideration is the second element: whether Brock's protected speech was a substantial or motivating factor in the decision to terminate his employment.

As noted, Brock reported racial profiling on two occasions between October 2001 and April 2004. In a protected speech retaliation case, it has been observed that "temporal proximity between protected activity and an adverse employment action can contribute to establishing" a case of retaliation. *Davison v. City of Minneapolis, Minn*, 490 F.3d 648, 657 (8th Cir. 2007). However, the lack of temporal proximity tends to disprove causation. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001), quoting *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248 (10th Cir. 2001).

Brock's termination of employment occurred on June 10, 2009, which was at least 5 years after Brock had reported that he believed he had observed racial profiling in the K-9 unit. Without other evidence, 5 years is not close enough in time to raise an inference of causation. See *Recio v. Creighton University*, 521 F.3d 934, 941 (8th Cir. 2008) (determining that 6 months between plaintiff's discrimination complaint and reduction of her assigned courses to teach was "not close enough to raise an inference of causation"); *Kipp v. Missouri Highway and Transp. Com'n*, 280 F.3d 893 (8th Cir. 2002) (determining that 2 months between plaintiff's complaint and her termination of employment did not establish causal link).

The lack of temporal proximity suggests that Brock's protected speech was not a substantial or motivating factor in the decision to terminate his employment. However, we are aware of other evidence in the record relating to a racial

profiling case, Omair v. Douglas County, Douglas County District Court, docket 1110, page 291, the pendency of which, taking the inferences favorable to Brock, favor the conclusion that Brock's evidence established a prima facie case of First Amendment retaliation. The Omair case involved an allegation of racial profiling of a driver, Michael Omair, on I-80 by Van Buren, filed against the appellees herein and other defendants. Brock's theory is that the claims in the Omair matter motivated the appellees to investigate and terminate Brock's employment in order to destroy his credibility as a potential witness on behalf of Omair.

The deposition testimonies of Brock and Murphy, a former sheriff's deputy, in the Omair case were received as evidence at the hearing on summary judgment in the instant case. On the whole, the testimony is anecdotal and, in particular, lacks specificity as to dates which would be helpful to establish causation. At one point, Murphy testified that he read a newspaper article shortly after the Omair case was filed in which Bilek stated that he had never heard of racial profiling by the agency. Murphy testified that in view of the meeting with Dunning and Bilek, "I don't believe it is a correct statement, no."

Elsewhere in the record, the deposition testimony of appellee Dunning, taken in this case, indicates that Dunning was aware of a lawsuit alleging racial profiling, that one of the individuals accused of racial profiling is Van Buren, and that he became aware of the matter "[s]ome time ago . . . ." Dunning explained that his counsel asked him to provide some documents and to prepare a document, exhibit 12, entitled "Internal Affairs Cases of Alleged Violations Against Deputies While Making a Traffic Stop." Exhibit 12 lists internal affairs investigations from "5/30/2003" through "1/5/2010," the last investigation of which involved Van Buren.

The Omair lawsuit, Omair v. Douglas County, Douglas County District Court, docket 1110, page 291, was filed in 2010. The defendants listed in the caption of the depositions from the Omair case are as follows: Douglas County; the Sheriff's Office; Dunning, in his official and individual capacities; and Van Buren, in his official and individual capacities. Because the defendants are subject to the Political Subdivisions

Tort Claims Act, the suit was necessarily preceded by the making of a claim within 1 year of the accrual of the action. See § 13-919(1). We can infer from the record that Omair made a claim sometime in 2009 and that it was rejected or withdrawn after 6 months, thus resulting in the lawsuit. See *id*. The record shows that the internal investigation of Brock commenced in April 2009.

Brock asserts that the Omair allegations were a matter of concern at the Sheriff's Office in 2009 and that they were troublingly reminiscent of Brock's allegations of racial profiling. Brock contends that because of his earlier racial profiling allegations, the appellees focused on the facts surrounding Brock's current workers' compensation matter in order to terminate his employment. An inference can be made on the record before us that allegations of racial profiling in the Omair case reignited the racial profiling allegations by Brock and that thus, Brock's protected speech allegations motivated the employment action against him. Given the summary judgment context in which we are reviewing the evidence, we determine that notwithstanding the passage of time, there is an inference Brock's earlier racial profiling comments were a substantial motivating factor in the decision to terminate Brock's employment, and that thus, the evidence shows a prima facie case of First Amendment retaliation.

Having established a prima facie case of First Amendment retaliation, the burden shifted to the appellees to show by a preponderance of evidence that the same decision would have been reached in the absence of protected activity. Having reviewed the record, we conclude that the evidence relating to the appellees' same-decision defense was such that no reasonable jury could fail to return a verdict for the appellees. That is, a review of the evidence shows that the appellees have demonstrated that the same employment action would have been taken in the absence of the protected activity.

The appellees presented evidence and the record indicates without dispute that Brock was untruthful or deceptive on three occasions, in violation of various General Orders of the Sheriff's Office, and that it was this untruthfulness that

resulted in Brock's termination of employment. For completeness, we note that there was other testimony regarding Brock's reputation for lack of candor or veracity in addition to these three discrete events. First, Brock was untruthful with one of his treating physicians, Dr. Hutton. Brock met with Dr. Hutton on March 17, 2009, and prior to their meeting, Dr. Hutton had reviewed surveillance video of Brock's operating a pickup truck with a snowplow attached. At their meeting, Dr. Hutton asked Brock about the range of activities Brock could perform, and specifically asked whether Brock could operate a snowplow. Dr. Hutton stated in his notes after the meeting that Brock stated "there was no way that he could even drive a truck or work a snow plow."

Second, Brock was not forthcoming with the physical therapist who conducted Brock's FCE on March 26, 2009. During the FCE, Brock failed to give a valid indication of his physical abilities because, according to the evidence, Brock had "self-limited several of the lifting tasks." The physical therapist was unable to complete an accurate assessment of Brock's physical abilities due to this self-limiting behavior.

Third, Brock was untruthful with the lieutenant who conducted the internal investigation regarding Brock. During an interview with Brock, the lieutenant asked Brock about his involvement with his father's business. At first, Brock denied any involvement, but after he was shown several documents indicating Brock's involvement, Brock admitted that he owned stock and participated in the lawn maintenance and snow removal business.

A letter from Bilek dated May 29, 2009, was sent to Brock notifying him of a predisciplinary hearing, and the letter outlined these three instances when Brock was untruthful. The May 29 letter alleged that based on his conduct, Brock had violated various General Orders of the Sheriff's Office. After the predisciplinary hearing was held, a letter from Bilek dated June 10, 2009, was sent to Brock notifying him of his termination of employment. The June 10 letter stated that Brock was "untruthful and deceptive when interacting with doctors, Workers Comp [sic] personnel and a Sheriff's Internal Affairs

investigator. After careful consideration of this matter, it has been determined that these violations are sufficiently serious to require termination of employment."

Even giving Brock the benefit of favorable inferences, the evidence presented by the appellees demonstrates as a matter of law that the same decision to terminate Brock's employment in June 2009 would have been reached in the absence of his protected speech. The district court's entry of summary judgment in favor of the appellees on this theory was not error.

*Second Cause of Action Under § 1983,*
*Third Theory: Surveillance Video*
*and Right to Privacy.*

In his third theory under § 1983, Brock alleged that his right to privacy had been violated when he was placed under surveillance in order to assess his physical capabilities. As to this theory, Brock claims that the district court erred when it determined that the surveillance conducted by the investigators on behalf of Douglas County was not a violation of his right to privacy. Although our analysis differs from that of the district court, we affirm the entry of summary judgment in favor of the appellees on this claim.

The district court analyzed Brock's violation of privacy claim under the Fourth Amendment, which provides individuals the right to be free from unreasonable searches and seizures. As a general matter, the Fourth Amendment applies to persons, houses, papers, and effects. See *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013). The district court determined that the use of private investigators was routine "in the industry" and that Brock had no expectation of privacy in the business parking lots where he was recorded plowing snow.

Brock claims that the district court erred when it analyzed his claim of violation of his right to privacy because the court did not apply the two-prong test from *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), a Fourth Amendment case. Brock refers us to *Katz*, which has been summarized as follows: "Since *Katz* . . . the touchstone of

[Fourth] Amendment analysis has been the question whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *Oliver v. United States*, 466 U.S. 170, 177, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984), quoting *Katz v. United States, supra* (Harlan, J., concurring). The U.S. Supreme Court has stated that

> in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

*Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998), quoting *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). We are not persuaded by Brock's Fourth Amendment analysis.

[16] Despite the parties' urging and the district court's analysis, we believe that Brock's right to privacy claim may better be analyzed under the framework provided by the Due Process Clause of the 14th Amendment. We have indicated that the Due Process Clause of the 14th Amendment contains a substantive component that provides some protection to a person's right of privacy. *State v. Wiedeman, supra*. Compare *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) (suggesting that right to privacy is rooted in penumbra of specific guarantees in Bill of Rights rather than Due Process Clause of 14th Amendment). The U.S. Supreme Court has said that privacy entails at least two kinds of interests: (1) the individual interest in avoiding disclosure of personal matters and (2) the interest of independence in making certain kinds of important decisions. *State v. Wiedeman, supra*. See, also, *Whalen v. Roe*, 429 U.S. 589, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977). The first type of interest is the "'right to be let alone,'" which has been characterized as "'the right most valued by civilized men.'" *Whalen v. Roe*, 429 U.S. at 599 n.25. The second type of interest protects individual autonomy in making decisions and engaging in conduct relating primarily to personal relationships. See *Whalen v. Roe, supra*. The first

privacy interest focuses on government action that is intrusive or invasive; the second concerns decisions or conduct by individuals. *Id*. The first privacy interest is implicated in the instant case.

Brock argues that his right to privacy was violated when Douglas County, through Johnson's office, hired private investigators and placed Brock under surveillance as a means to determine Brock's level of physical activity outside the workplace. Brock asserts that he was placed under surveillance from May 2007 to February 2009. He contends that such conduct, done at the direction of a Douglas County employee, was intrusive and offends societal standards.

Challenges to surveillance in workers' compensation cases are not uncommon. In *Tagouma v. Investigative Consultant Servs*., 4 A.3d 170 (Pa. Super. 2010), an employee who had been videotaped sued a surveillance company hired by the employer's workers' compensation carrier and the investigator for the company. The Superior Court of Pennsylvania determined that videotape surveillance of the injured employee did not violate the worker's privacy. In making its decision, the court stated:

> "It is not uncommon for defendants in accident cases to employ investigators to check on the validity of claims against them. Thus, by making a claim for personal injuries appellant must expect reasonable inquiry and investigation to be made of her claim and to this extent her interest in privacy is circumscribed. It should be noted that all of the surveillances took place in the open on public thoroughfares where appellant's activities could be observed by passers-by. To this extent appellant has exposed herself to public observation and therefore is not entitled to the same degree of privacy that she would enjoy within the confines of her own home.
>
> "Moving to the question of whether [the investigator's] conduct is reasonable, we feel that there is much social utility to be gained from these investigations. It is in the best interests of society that the valid claims be ascertained and fabricated claims be exposed."

*Id*. at 175, quoting *Forster v. Manchester*, 410 Pa. 192, 189 A.2d 147 (1963). See, also, 7 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 127.10 (2011) (discussing admissibility of video and photographic evidence of employee and privacy issues). We have long approved the admission of surveillance videotapes in workers' compensation cases. See, e.g., *Harpham v. General Cas. Co*., 232 Neb. 568, 441 N.W.2d 600 (1989).

The appellees presented evidence which showed that the surveillance was not unique to Brock, that it served a valid purpose, and that it was not intrusive. Johnson testified that she authorizes surveillance in approximately 5 to 10 cases per year. She stated that these observations help verify "the level of physical activity of the [claimants] outside the work environment, and then to correlate that activity with the medical treatment records." Until a task force meeting was held in April 2009, where Johnson showed Dunning and others the videotape of Brock's plowing snow in February 2009, the undisputed evidence showed that Dunning was unaware of the surveillance. In this case, the record shows that when Brock was under surveillance, he was in places that were open to the public, and he was not videotaped regarding personal matters. In particular, Brock exposed himself to public observation when he plowed snow in a business parking lot. By the introduction of this evidence, the appellees demonstrated that Brock's privacy interest had not been violated and that they were entitled to judgment on this theory.

In response, Brock referred the district court to evidence showing that the surveillance had been conducted for 100 hours from May 2007 to February 2009. He claimed that this amount of surveillance was intrusive and offends societal norms. He did not dispute the fact that the surveillance was entirely in public places. We determine that the district court did not err when it determined that Brock has not shown that the appellees' conduct violated his constitutional right to privacy. The appellees' evidence showed they were entitled to judgment as a matter of law on this theory, and Brock's evidence did not show there was a genuine issue of material fact preventing

summary judgment in their favor. The district court's entry of summary judgment in favor of the appellees on this theory was not error.

## CONCLUSION

With respect to Brock's first cause of action, the district court determined that because Brock failed to show that he made a written claim for the tort of wrongful discharge in retaliation for filing his workers' compensation claim, his claim was barred under § 13-919(1) and entered summary judgment in favor of the appellees on this cause of action. With respect to Brock's second cause of action under § 1983, the district court determined that the appellees did not violate Brock's constitutional right to property, right to freedom of speech, or right to privacy and entered summary judgment in favor of the appellees on each of these three theories. Although our reasoning differs somewhat from that of the district court, we find no error in the entry of summary judgment in favor of the appellees on both causes of action, and, therefore, we affirm.

AFFIRMED.

———————————

Big John's Billiards, Inc., a Nebraska corporation, appellee and cross-appellant, v. State of Nebraska et al., appellants and cross-appellees, and Douglas County Health Department, appellee.

___ N.W.2d ___

Filed August 29, 2014.    No. S-13-803.

1. **Constitutional Law: Statutes: Appeal and Error.** Whether a statute is constitutional presents a question of law, which the Nebraska Supreme Court resolve independently of the lower court's determination.
2. **Constitutional Law: Statutes: Presumptions.** A statute is presumed to be constitutional, and all reasonable doubts are resolved in favor of its constitutionality.
3. **Constitutional Law: Statutes: Proof.** The burden of establishing the unconstitutionality of a statute is on the one attacking its validity.
4. ____: ____: ____. The unconstitutionality of a statute must be clearly established before it will be declared void.